```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION
```

SANDRA TRAVIS HARDEN,                )
Executrix of the Estate of           )
Maury Troy Travis,                   )
                                     )
                Plaintiff,           )
                                     )
        vs.                          )        No. 4:04-CV-602 (CEJ)
                                     )
ST. LOUIS COUNTY, et al.,            )
                                     )
                Defendants.          )

## MEMORANDUM AND ORDER

This matter is before the Court on the defendants' joint motion for summary judgment on plaintiff's third amended complaint.[1] See Fed. R. Civ. P. 56. Plaintiff has filed an opposition to the motion, and she separately moves to dismiss her complaint without prejudice.

On June 10, 2002, Maury Travis hanged himself in a cell in the St. Louis County Justice Center jail. His mother, plaintiff Sandra Travis Harden, brings this 42 U.S.C. § 1983 action against defendants St. Louis County, Roy Mueller (Director of Department of Justice Services), Captain Jessie Riddle-Rush (Watch Commander), John Szuba (Unit Manager), Correctional Officer Charles McKnight, and Correctional Officer Bobby Vinson.[2] Plaintiff alleges that the individual defendants acted with deliberate indifference, that the

---

[1] The Court previously dismissed all but Counts I, III and IV of the third amended complaint. The instant summary judgment motion is directed only to the remaining counts.

[2] Plaintiff named Intake Nurse Louis Youngblood as a defendant. In her response to the summary judgment motion, she concedes that her claims should be dismissed with respect to defendant Youngblood.

supervisory defendants failed to properly supervise and train defendants McKnight and Vinson, and that St. Louis County placed Mr. Travis in a cell in a dangerous condition. Plaintiff further alleges that the individual defendants' actions were in accordance with a policy or practice and custom of St. Louis County.

I. **Legal Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Fed. R. Civ. P. 56(c). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). Rule 56(c) "mandates the entry of summary judgment, after adequate

time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).

**II. Background**

On Saturday, June 8, 2002, Maury Travis was arrested on charges of first-degree murder and kidnapping, in connection with a series of murders in the St. Louis area. The United States Marshals Service delivered Mr. Travis to the St. Louis County Justice Center jail. During the intake process, Mr. Travis denied having a history of mental illness or suicidal behavior. However, due to the nature of the charges against him, the Marshals Service informed the booking officer that Mr. Travis should be considered potentially suicidal and provided a written notice to that effect. The booking officer accordingly initiated suicide alert status for Mr. Travis in the automated jail management system and Nurse Youngblood made a referral for psychological assessment.

The jail had two housing options for inmates who are identified as suicidal: the infirmary or the eighth-floor maximum security cells. According to defendant Roy Mueller, the eighth floor is a more secure area and thus is preferred for violent or dangerous inmates or those who present a risk of escape. Defendants Jessie Riddle-Rush, the watch commander, and Mueller decided to assign Mr. Travis to a "supermax" cell on the eighth floor. Factors they considered in making this decision included

the high-profile charges against Mr. Travis, the possibility that he was suicidal, and the lack of any specific information about whether he had enemies in the jail.

Each maximum security pod houses up to 48 inmates and is supervised by two corrections officers.[3] The "unit control officer" remains in the "bubble" from which he operates the controls that open and close the cell doors. The "movement officer" conducts tours of the pod, which are noted in a computerized log. At the time of Travis's confinement, policy directed the movement officer to visually check on a suicidal inmate every fifteen minutes. In addition, a suicide prevention monitor was assigned to a post outside the cell of a suicidal inmate.[4]

The No. 7 and No. 8 cells are known as "supermax cells." These cells share a small, secure adjoining recreation/shower area called the "sallyport area". Inmates in the supermax cells can be released to the sallyport area without any direct contact with corrections officers or other inmates. The No. 8 cell differs from the No. 7 cell in that an observer cannot see the entire cell if he is standing anywhere other than in the sallyport. According to

---

[3]By contrast, the general population pods house up to sixty-four inmates supervised by one correctional officer.

[4]Suicide prevention monitors were jail inmates who were being held on lesser, non-violent charges and who had records of good behavior. They were given specific training to identify and respond to behaviors that might indicate a risk of suicide. They were required to constantly monitor an inmate on suicide watch. They were also required to refrain from any distracting activities, such as talking to other inmates or reading, while on duty.

defendant Mueller, the restricted sight lines are considered useful to partially isolate disruptive inmates and to prevent an inmate contemplating escape from viewing the routine movements of staff and inmates. He acknowledges, however, that the restricted view makes the No. 8 cell less than ideal for housing a suicidal inmate.

An inmate confined in one of the supermax cells is permitted one hour of solitary recreation or "walk time" per day; in June 2002, the practice was to leave the inmate's cell door unsecured during his walk time. Jail procedures prohibit other inmates from being in the sallyport during an inmate's walk time; when a suicide prevention monitor is assigned to an inmate, the monitor would move to the dayroom when the inmate was on walk time. From the dayroom, the entire No. 7 cell is clearly visible, but the back wall and air vent of the No. 8 cell cannot be seen.

Mr. Travis was escorted to the No. 8 cell in Pod 8-B1 at 4:15 p.m. on June 8. According to defendants, this was the only unoccupied supermax cell at the time. Inmate Danny Cantrell was confined in the No. 7 cell and was on suicide watch. Thus, a suicide prevention monitor was already stationed in the sallyport area. The suicide monitor system was in effect around the clock throughout Mr. Travis's confinement in the cell. As noted above, however, the monitor would move to the dayroom during either inmate's walk time.

Nursing and corrections staff interacted briefly with Mr. Travis throughout the weekend, without noting any signs of suicidal ideation or agitation. Psychologist Alan Krasnoff received Nurse

Youngblood's intake referral on Mr. Travis and, on Monday, June 10, at 2:00 p.m., he attempted to conduct a psychological evaluation. Mr. Travis, however, declined to speak with Dr. Krasnoff and refused to sign a form advising him that mental health services would be provided to him upon his request. Dr. Krasnoff noted that Mr. Travis was calm and exhibited no signs of distress or agitation. Dr. Krasnoff arranged for a social worker to offer Mr. Travis mental health services again at a later time.

Defendants Vinson and McKnight came on duty in Pod B at 2:20 p.m. on June 10. In accordance with standard practice, Vinson and McKnight divided the shift, with McKnight acting as the unit control officer for the first four hours and Vinson as the movement officer. McKnight was not regularly assigned to the eighth floor.

At 3:00 p.m., inmate Cantrell was in the sallyport area for his walk time. He became disruptive and was ordered back to his cell. Some time later, the suicide prevention monitor and Mr. Travis both reported to McKnight in the control room that Cantrell was attempting to urinate on the monitor through the porthole in his cell door. Lieutenant Smallegan and defendant Vinson placed inmate Cantrell in a restraint chair and removed him from the area. Cantrell was returned to his cell at 6:45 p.m. Defendant Vinson was then the control officer and defendant McKnight was the movement officer.

At 6:58 p.m., Mr. Travis called defendant Vinson on his intercom to ask for his walk time. At 7:01 p.m., defendant Vinson directed the suicide prevention monitor to step out of the

sallyport, and he then unlocked the door to the No. 8 cell. At 7:15 p.m., defendant Vinson admitted defendant McKnight to the sallyport to give Cantrell a conduct report; McKnight noted that Travis was in the shower at that time.[5] Defendant McKnight then toured the remainder of Pod B. The suicide prevention monitor, who was then outside the sallyport, walked across the dayroom and, contrary to rules, began socializing with other inmates.

At 7:30 p.m., inmate Cantrell used the intercom to ask defendant Vinson if he could resume his walk time. When told that he had forfeited his time, Cantrell began pressing the intercom button to complain. At 7:45 p.m., defendant McKnight began a tour; at approximately 8:00 p.m., he went into an interview room to work on a report.

At 8:02 p.m., defendant Vinson used the intercom to tell Mr. Travis to lock down. Inmate Cantrell answered the call and said that Mr. Travis had already entered his cell. Defendant Vinson remotely secured the door to Mr. Travis's cell and directed the suicide prevention monitor to return to the sallyport. The monitor immediately called out that Mr. Travis was trying to hang himself. Defendant Vinson called defendant McKnight, who triggered an emergency code.

At 8:06 p.m., a team of corrections officers and medical personnel entered Mr. Travis's cell. He was found hanging from the

---

[5]As discussed below, policy prohibited defendant McKnight from entering the supermax area while Mr. Travis was released from his cell.

-7-

air vent from a noose fashioned from a strip of bed sheet threaded through the grate.  A plastic cover torn from his pillow was over his head.  The responding personnel cut the noose and removed the plastic cover.  They discovered that Mr. Travis had a wash cloth in his mouth and tissue paper stuffed into his nostrils.  His hands were bound behind his back with another strip of bed sheet.  He had no pulse or heart activity.  Mr. Travis was transported to the hospital, where he was pronounced dead.[6]

Cantrell stated that he last saw Mr. Travis shortly after 7:15 p.m. when Mr. Travis returned to his cell.  Defendant McKnight initially stated that he last saw Mr. Travis at 7:45 p.m. when he entered the supermax sallyport to give Cantrell his incident report.  When confronted by Cantrell's contrary story and the possibility that Mr. Travis was in the midst of hanging himself at that time, McKnight admitted that he had lied because he knew he had violated policy by entering the sallyport at 7:15 while Mr. Travis was released for walk time.

There was a forty-five minute period during which Travis was unobserved.  Under departmental policy, defendant McKnight should have toured the pod at 7:30 p.m. and at 7:45 p.m.  Defendants McKnight and Vinson both denied knowing that jail policy required fifteen-minute checks on inmates placed on suicide watch.  However,

---

[6]There is no dispute that Mr. Travis died as a result of suicide:  he left a suicide note written in his own hand, and the medical examiner found no evidence of collateral injuries that would indicate that he had been overpowered or coerced by another person.

records indicate that both defendants had received training on this policy.

In the course of the post-incident investigation, Major Reed examined the electronic log to determine whether corrections officers were documenting fifteen-minute checks on all inmates on suicide watch; he also interviewed the corrections officers assigned to the 8th floor. He determined that only some officers completed the checks; several others stated that they were unaware that they were required to check suicidal inmates at fifteen-minute intervals. The eighth-floor lieutenants reported that they were never instructed to emphasize the fifteen-minute checks or to look for documentation of the checks.

Many officers told Reed that they focused on completing the thirty-minute tours of the pods, as directed by their Unit Manager, defendant John Szuba. An audit completed in January 2002 by the American Correctional Association found that the eighth-floor officers were not consistent in completing the tours. Remedial measures were put in place following the audit to increase completion and documentation of the 30-minute tours. Notwithstanding the additional emphasis, the electronic log does not reflect that McKnight and Vinson completed all tours on time during their shift on June 10, 2002.

McKnight received a disciplinary suspension for failing to timely complete a tour of the pod and for entering the sallyport while Mr. Travis was in the sallyport; Vinson was suspended for allowing McKnight into the sallyport and for not preventing the

-9-

suicide prevention monitor from wandering from his post. Unit Manager John Szuba was suspended for failing to ensure that his staff knew they were required to check on suicidal inmates every fifteen minutes.

Maury Travis was the first inmate to commit suicide in the new Justice Center jail, which opened in March 1998. Several changes were implemented as a result of the investigation into this incident: the No. 8 cells are no longer used for suicide watch and the doors to the supermax cells are secured during walk time to prevent an inmate from returning to the cell unseen. An additional corrections officer has been assigned to the eighth floor to ensure that fifteen-minute checks on suicidal inmates are completed. Corrections officers receive additional training about the suicide watch procedures. A protocol for assessing and managing inmates facing extremely serious criminal charges was developed.

### III. Discussion

#### Count I: Individual Liability – Deliberate Indifference

A government official is shielded from suit for damages if a reasonable official could have believed his or her conduct to be lawful, in light of clearly established law and the information possessed by the official. Olson v. Bloomberg, 339 F.3d 730, 735 (8th Cir. 2003). To overcome qualified immunity, a plaintiff "[1] must assert the violation of a constitutional right; [2] that right must have been clearly established at the time of the violation; and [3] given the facts most favorable to the plaintiff, there must be no genuine issues of material fact as to whether a reasonable

official would have known that the alleged action indeed violated that right." Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000), quoting Liebe v. Norton, 157 F.3d 574, 577 (8th Cir. 1998).

Section 1983 claims arising out of jail suicide cases are analyzed as a failure to provide appropriate medical care and the Court's inquiry is whether officials demonstrated "deliberate indifference." Olson, 339 F.3d at 735. The first two parts of the qualified immunity analysis are satisfied in a jail suicide case. See Gregoire, 236 F.3d at 417; Lambert v. City of Dumas, 187 F.3d 931, 936 (8th Cir. 1999) ("The right to have medical needs addressed includes the right to be protected from a known risk of suicide.").

A prison official may be held liable for deliberate indifference if he (1) knows that the inmate faces a substantial risk of serious harm and (2) fails to take reasonable measures to abate that risk. Olson, 339 F.3d at 735, quoting Farmer v. Brennan, 511 U.S. 825, 847 (1994). Deliberate indifference is akin to criminal recklessness and requires something more than mere negligent misconduct. Drake ex rel. Cotton v. Koss, 445 F.3d 1038, 1042 (8th Cir. 2006). In the context of jail suicide cases, even if an official knows of a risk of suicide, and a suicide occurs, the official is entitled to qualified immunity if he "could reasonably believe that the response to the risk was not deliberately indifferent (or reckless) to that risk." Gregoire, 236 F.3d at 418.

Plaintiff contends that defendants Riddle-Rush and Mueller were deliberately indifferent when they assigned Mr. Travis to the "dangerous" No. 8 cell. She argues that the cell was dangerous by virtue of two factors: First, the ventilation grate allowed Mr. Travis to thread and secure a piece of bed sheet. Second, it was not possible for an observer to have a complete view of the cell from any vantage point other than the sallyport. Observers could not remain in the sallyport during the walk time of a supermax inmate. Thus, there were potentially two hours in every twenty-four hour period during which the occupant of the No. 8 cell could evade constant observation by standing at the rear wall of the cell.

In order to hold defendants Riddle-Rush and Mueller liable, plaintiff must establish that they knew the cell was dangerous when they made the cell assignment. Plaintiff relies on Mueller's post-incident conclusion that the supermax cells, "while . . . the Justice Center's very best options for housing high security risks, . . . are a much poorer choice for housing suicidal inmates." Plaintiff has no evidence, however, that this knowledge was available to defendants Riddle-Rush and Mueller before Mr. Travis's suicide. The Court will grant summary judgment to defendants Riddle-Rush and Mueller on Count I of the third amended complaint.

With regard to defendant John Szuba, the Housing Unit Manager, the undisputed facts establish that he was not on duty at any time during Mr. Travis's confinement. Szuba was not notified that Mr. Travis was in confinement or on suicide watch. Plaintiff thus

cannot establish that defendant Szuba was deliberately indifferent to the risk that Mr. Travis would commit suicide. The Court will grant defendant Szuba summary judgment on Count I of the third amended complaint.

Plaintiff alleges that defendants Vinson and McKnight were deliberately indifferent because they left Mr. Travis unattended for forty-five minutes. Both men testified that they did not know that Mr. Travis was on suicide watch. Corrections officers received verbal reports regarding specific inmates either at "shift briefings" or from the officer they were replacing. There is no evidence, however, that verbal reports about Mr. Travis were provided in this instance. Vinson testified that he learned from the officer he relieved that Cantrell "had been problematic that day," but he could not recall being told anything about Mr. Travis. The information that Mr. Travis was on suicide watch was entered into the Jail Management System; once again, however, there is no evidence that this information was disseminated to defendants Vinson and McKnight. Plaintiff argues that defendants must have known that Mr. Travis was suicidal because a suicide prevention monitor was in place. It is undisputed, however, that the monitor was assigned to the area for inmate Cantrell before Mr. Travis was placed in the No. 8 cell. Furthermore, Mr. Travis exhibited no behavioral or clinical signs that he was a suicide risk.

McKnight and Vinson failed to complete fifteen-minute checks on Mr. Travis, as required by policy, but plaintiff adduces no evidence that they knew about the policy. They did know that they

-13-

were supposed to complete thirty-minute tours of the pod. However, in the absence of evidence that they knew that Mr. Travis posed a substantial risk of suicide, their failure to conduct thirty-minute tours does not rise to the level of deliberate indifference. The Court will grant summary judgment in favor of defendants Vinson and McKnight on Count I.

### **Count III: Municipal Liability**

Defendant St. Louis County cannot be held liable for the actions of its employees under a theory of *respondeat superior*. Monell v. Department of Soc. Servs., 436 U.S. 658, 691 (1978). A municipality may be liable for the unconstitutional acts of its employees when those acts implement or execute an unconstitutional policy or custom. Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999). A section 1983 plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." Board of County Com'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997) (emphasis in original).

Plaintiff argues that the County had a custom of allowing its employees to ignore policies. To establish a constitutional violation arising from such a custom, a plaintiff must show that the injury was "caused by municipal employees engaging in a widespread and persistent pattern of unconstitutional misconduct that municipal policymakers were either deliberately indifferent to or tacitly authorized." Russell v. Hennepin County, 420 F.3d 841, 849 (8th Cir. 2005), citing Larson v. Miller, 76 F.3d 1446, 1453

(8th Cir. 1996) (en banc). In this instance, plaintiff must show that there was a widespread and persistent failure to follow policy, that a policymaker was aware of this failure and was either deliberately indifferent to or tacitly approved of the conduct, and that Mr. Travis's suicide was caused by the custom of failing to follow the policy. Id.

Plaintiff cites defendant Mueller's statement that his "investigation determined that suicide watch procedures were inconsistently implemented." Plaintiff cites no evidence that would support a finding that St. Louis County policymakers were aware of this deficiency in adhering to standard procedures before Mr. Travis's death. Summary judgment will be granted with respect to Count III.

### Count IV: Supervisory Liability

Plaintiff alleges that defendants Riddle-Rush, Mueller, and Szuba are liable for failing to train and supervise defendants McKnight and Vinson. Plaintiff must demonstrate that the supervisory defendants had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation. Tlamka v. Serrell, 244 F.3d 628, 635 (8th Cir. 2001), quoting Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996). Under this theory of liability, plaintiff must show that the supervisory defendants were "deliberately indifferent to or tacitly authorized the offending acts." Vaughn v. Greene County, Arkansas, 438 F.3d 845, 851 (8th Cir. 2006), quoting Wever v. Lincoln County, Nebraska, 388 F.3d 601, 606 (8th Cir. 2004).

Plaintiff claims that, on June 10, 2002, there were deficiencies in the regular performance of thirty-minute tours, despite a corrective plan designed specifically to address this problem. Plaintiff's evidence indicates that on June 10, 2002, no thirty-minute tour was documented for the B-1 pod between 5:33 p.m. and 6:53 p.m.. However, there is no dispute that McKnight saw Mr. Travis at 7:15 p.m., began a tour at 7:24 p.m., and began his next tour thirty-three minutes later at 7:57 p.m.. On this record, plaintiff cannot establish a link between the sporadic performance of the thirty-minute tours and Mr. Travis's suicide. Summary judgment will be granted in favor of the defendants on Count IV.

### **Plaintiff's Motion to Dismiss**

Plaintiff filed a motion to dismiss her complaint, without prejudice, with plaintiff to bear costs. Once an answer or a motion for summary judgment has been filed, an action may be dismissed at the plaintiff's request only upon order of the court and upon such terms and conditions as the court deems proper. See Fed.R.Civ.P. 41(a)(1)(i). The factors the court considers include whether the party has presented a proper explanation for its desire to dismiss, whether a dismissal would result in a waste of judicial time and effort, and whether a dismissal will prejudice the defendants. A party is not permitted to dismiss merely to escape an adverse decision or to seek a more favorable forum. Hamm v. Rhone-Poulenc Rorer Pharmaceuticals, Inc., 187 F.3d 941, 950 (8th Cir. 1999) (citations omitted).

Plaintiff filed her motion after the briefing on defendants' summary judgment motion was complete and one week before the parties' pretrial compliance was due. Substantial resources have been expended by the parties and the Court in bringing the matter to this stage in the litigation. Plaintiff offers no explanation for her desire to dismiss and, after considering the relevant factors, the Court concludes that dismissal without prejudice is unwarranted.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment [#113] is **granted**.

**IT IS FURTHER ORDERED** that plaintiff's third amended complaint is **dismissed with prejudice** with respect to defendant Louis Youngblood.

**IT IS FURTHER ORDERED** that plaintiff's motion to dismiss without prejudice [#122] is **denied**.

A separate judgment in accordance with this Memorandum and Order will be entered.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 27th day of November, 2006.